DAVID B. ROSEN (Attorney ID No. 7152-0)
PITE DUNCAN, LLP
810 Richards Street, Suite 880
Honolulu, HI 96813
Ph.: (808) 275-4490
E-mail: RosenLaw@hawaii.rr.com

DAVID E. McALLISTER (Attorney ID No. 7660)
CHRISTIAN FENTON (Attorney ID No. 8727)
PITE DUNCAN, LLP
4375 Jutland Drive, Suite 200
P.O. Box 17935
San Diego, CA 92177-0935
Telephone: (858) 750-7600
Facsimile: (858) 412-2602
E-mail: dmcallister@piteduncan.com

Attorneys for Plaintiff WELLS FARGO BANK, N.A.

IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| WELLS FARGO BANK, N.A., <br><br> Plaintiff, <br><br> v. <br><br> KIMBERLY L. BURGER; <br> THE ASSOCIATION OF APARTMENT <br> OWNERS OF PACIFIC SHORES; <br> and DOES 1 through 20, inclusive, <br><br> Defendants. | CIVIL NO. 12-1-0639(1) <br> (Foreclosure) <br><br> **COMPLAINT TO FORECLOSE <br> MORTGAGE; EXHIBITS A-D; <br> SUMMONS** |

## COMPLAINT TO FORECLOSE MORTGAGE

**COMES NOW** Plaintiff WELLS FARGO BANK, N.A. ("Plaintiff"), for cause of action against the above-named Defendants, and alleges as follows:

1.     Plaintiff is, and at all times relevant was, a national association, authorized to do business in the State of Hawaii.

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2012 JUN 27 PM 3: 11

H. CHING
EX OFFICIO CLERK

i do hereby certify that this is a full, true, and correct copy of the original.

Clerk, Circuit Court, First Circuit

EXHIBIT "A"

2.      Defendant KIMBERLY L. BURGER ("BURGER") is the record owner of that certain parcel of real property commonly known as 2219 South Kihei Road #B202, Kihei, Hawaii 96753 (TMK NO. (2) 3-9-018-002-0084) ("Property"), which, including all improvements and fixtures, is the subject matter of this foreclosure action. The legal description of the Property is set forth in **Exhibit A** attached to this Complaint and incorporated herein by reference.

3.      WELLS FARGO BANK, N.A. is the holder of a second mortgage on the Property recorded in the Bureau of Conveyances of the State of Hawaii, as Document No. 2006-179986. By operation of law, this second mortgage will be extinguished by the present foreclosure action.

4.      Defendant THE ASSOCIATION OF APARTMENT OWNERS OF PACIFIC SHORES may claim an interest in the Property.

5.      The true names of the Defendants herein named as DOES 1 through 20, inclusive, are unknown to Plaintiff and include all other persons claiming any legal right, title, estate, lien or interest in the property described in the Complaint adverse to Plaintiff's interest, or any cloud upon Plaintiff's title thereto. These unknown Defendants, and each of them, claim some right, title, estate, lien or interest in the Property adverse to Plaintiff's interest; and their claims, and each of them, constitute a cloud on title to the Property. Plaintiff will amend this Complaint to reflect the true names of said unknown Defendants when the same are ascertained.

6.      Each of said DOE Defendants has, or claims to have, some interest in the Property, which interest or claim is subsequent to and subject to the lien in favor of Plaintiff's Mortgage.

7.      For valuable consideration, BURGER executed and delivered an Adjustable Rate Note dated September 21, 2006 to Plaintiff in the amount of $329,600.00, plus interest at the initial rate of 6.375% per annum ("Note").  A true and correct copy of the Note is attached to this Complaint as **Exhibit B** and incorporated herein by reference.  Plaintiff is the current holder of the Note.

8.      The Note is secured by a Mortgage dated September 21, 2006, executed by BURGER, as mortgagor, in favor of Plaintiff, encumbering the Property ("Mortgage").   On October 2, 2006, the Mortgage was recorded in the Bureau of Conveyances of the State of Hawaii as Document No. 2006-179985.  A true and correct copy of the Mortgage is attached to this Complaint as **Exhibit C** and incorporated herein by reference.

9.      As of April 1, 2011, BURGER is in default in the payment of principal and interest mentioned in the Note.  As a result of such default and in accordance with the terms of the Note and Mortgage, the entire aggregate amount of the principal obligation of the Note and Mortgage unpaid, together with interest, advances and charges, has become and is now due and payable.  Although demand has been made by Plaintiff with respect to the principal and interest due and payable to Plaintiff, BURGER has failed to pay the same.

10.      In compliance with Paragraph 22 of the Mortgage, Plaintiff sent a letter dated March 9, 2012, to BURGER advising of the default under the Note and Mortgage, providing thirty three (33) days to cure the default, advising that failure to cure the default within the thirty three (33) days provided may result in Plaintiff's option to accelerate the entire balance outstanding under the terms of the Note and Mortgage, and advising of the right to reinstate after acceleration (the "Notice of Acceleration"). A true and correct copy of the Notice of Acceleration is attached to this Complaint as **Exhibit D** and incorporated herein by reference.

11.     As a result of the above facts, Plaintiff is entitled to a foreclosure of its Mortgage and to a sale of the Property in accordance with the terms of the Mortgage.

12.     The Mortgage provides that in the event of foreclosure, Plaintiff may be awarded all expenses incurred in pursuing this remedy, including reasonable attorneys' fees and costs, expenses or advances made necessary or advisable or sustained by Plaintiff because of default or in order to protect the security of the Mortgage. As of May 25, 2012, the total amount of the principal, interest, and escrow advances due and owing under the Note is $347,477.08, which is exclusive of all fees, costs, and late charges.  In addition, per diem interest in the amount of $26.95 will continue to accrue on the principal from May 25, 2012 to the next interest rate change and accrue thereafter in accordance with the variable rate as set forth in the Note.

13.     The Mortgage provides that BURGER will pay to Plaintiff its reasonable attorneys' fees, together with all costs incurred therewith incident to Plaintiff's enforcement of the terms of the contract.  It has become necessary for Plaintiff to engage the law firm of Pite Duncan, LLP for the purpose of bringing this action.  Therefore, Plaintiff is entitled to a further and additional sum as and for reasonable attorneys' fees which it has incurred in this action.

14.     Any and all of the Defendants named herein claim or may claim some interest in the Property.  These interests, however, are subsequent, subordinate or junior to the lien of Plaintiff's Mortgage.

**WHEREFORE**, Plaintiff prays:

1.     That process of this Court issue commanding the Defendants to appear or answer the allegations of this Complaint and to perform and abide by all Court orders, directions and decrees.

2.     That upon hearing, the Court ascertain the total amount due to Plaintiff at the time of judgment upon the Note and the Mortgage, including principal, interest, advances, costs and attorneys' fees, and that this Court determine and order:

a.     That there is due and owing to Plaintiff by virtue of the terms of said Note and said Mortgage and of all the proofs adduced, a certain sum of money, and that the sum of money, together with legal interest accrued, and all advances, costs and attorneys' fees, be declared to be a first lien upon the Property; that the Court fix and determine just and reasonable attorneys' fees and expenses for Plaintiff's attorney.

b.     That any interest or lien claimed by any Defendants be adjudicated subordinate and junior to the lien of Plaintiff's Mortgage.

c.     That this Court appoint a Commissioner to take possession of the Property described or mentioned in the Mortgage, and that the Commissioner be authorized to collect rents, deal with the Property and to sell the Property for cash in the manner provided by law and by the order of this Court; and that upon confirmation of the sale by this Court, the Commissioner be authorized and directed to make and deliver to the purchaser of the Property such instrument of conveyance of the Property as may be appropriate, free and clear of all liens, encumbrances and claims of creditors.

d.     That after the payment of all necessary expenses of such sale and attorneys' fees and expenses, the Commissioner be authorized and directed to make the application of the proceeds thereof, so far as the same may be necessary for the payment of sums due and owing to Plaintiff herein, including all costs and expenses.

e.     That Plaintiff be allowed to become a purchaser in the sale and credit bid its claim to the extent applicable.

f.     That if the proceeds of the sale shall be insufficient to pay the aforesaid sum to Plaintiff and it shall appear that a deficiency exists, that judgment then be entered for such deficiency against BURGER, and that Plaintiff have execution thereof.

g.     That Plaintiff have such other and further relief as may be just and to the Court seem proper.

WE ARE ATTEMPTING TO COLLECT THE DEBT AND ANY INFORMATION WILL BE USED FOR THAT PURPOSE.

DATED: San Diego, California, June _____26_____, 2012.

_____
CHRISTIAN FENTON
Attorney for Plaintiff
WELLS FARGO BANK, N.A.

# EXHIBIT A



## EXHIBIT A

THE LAND REFERRED TO IN THIS GUARANTEE IS SITUATED IN THE **STATE OF HAWAII, COUNTY OF MAUI, CITY OF KIHEI**, AND IS DESCRIBED AS FOLLOWS:

FIRST:-

APARTMENT NO. B202 OF THAT CERTAIN CONDOMINIUM PROJECT KNOWN AS "PACIFIC SHORES", AS DESCRIBED IN FIRST AMENDMENT TO AND RESTATED DECLARATION OF CONDOMINIUM PROPERTY REGIME OF PACIFIC SHORES DATED NOVEMBER 5, 1992, FILED IN THE BUREAU OF CONVEYANCES OF THE STATE OF HAWAII AS DOCUMENT NO. 92-180145, OF WHICH THE ORIGINAL DECLARATION, DATED JULY 12, 1989, IS RECORDED IN THE BUREAU OF CONVEYANCES OF THE STATE OF HAWAII IN LIBER 23472 AT PAGE 48, AS SHOWN ON CONDOMINIUM MAP NO. 1227 AND ANY AMENDMENTS THERETO.

TOGETHER WITH APPURTENANT EASEMENTS AS FOLLOWS:

(A)   AN EXCLUSIVE EASEMENT TO USE THE PARKING STALL(S), IF ANY, AS SHOWN IN SAID DECLARATION, AS AMENDED.

(B)   EXCLUSIVE EASEMENTS TO USE OTHER LIMITED COMMON ELEMENTS APPURTENANT TO SAID APARTMENT AND DESIGNATED FOR THEIR EXCLUSIVE USE BY THE DECLARATION.

(C)   NONEXCLUSIVE EASEMENTS IN THE COMMON ELEMENTS DESIGNED FOR SUCH PURPOSES FOR INGRESS TO, EGRESS FROM, UTILITIES SERVICES FOR, AND SUPPORT, MAINTENANCE AND REPAIR OF SAID APARTMENT, AND IN THE OTHER COMMON ELEMENTS FOR USE ACCORDING TO THEIR RESPECTIVE PURPOSES.

(D)   ALL OTHER RIGHTS, PRIVILEGES AND EASEMENTS DESCRIBED IN THE DECLARATION, AS BEING APPURTENANT TO SAID APARTMENT.

SECOND: -

THE UNDIVIDED 0.9044% INTEREST IN ALL COMMON ELEMENTS OF THE CONDOMINIUM PROJECT, INCLUDING THE LAND ON WHICH THE CONDOMINIUM PROJECT IS LOCATED, AS ESTABLISHED FOR SAID APARTMENT BY THE DECLARATION OR SUCH OTHER PERCENTAGE OR FRACTIONAL INTEREST AS MAY HEREAFTER BE ESTABLISHED FOR SAID APARTMENT BY ANY AMENDMENT OF THE DECLARATION, AS TENANT IN COMMON WITH THE OTHER CURRENT AND FUTURE OWNERS AND TENANTS FROM TIME TO TIME THEREOF.

THE LAND UPON WHICH SAID CONDOMINIUM PROJECT "PACIFIC SHORES" IS LOCATED IS DESCRIBED AS FOLLOWS:

ALL OF THAT CERTAIN PARCEL OF LAND (BEING PORTION OF THE LAND DESCRIBED IN AND COVERED BY LAND PATENT GRANT NUMBER 7925 TO MRS. K. THOMPSON) SITUATE, LYING AND BEING ON THE EAST SIDE OF KIHEI ROAD AT KAMAOLE, KIHEI, ISLAND AND COUNTY OF MAUI, STATE OF HAWAII, BEING LOT 23-B-I OF THE "PHILIP D. HAAKE ESTATE SUBDIVISION", AND BEING A PORTION OF LOT 23-B OF THE "KAMAOLE HOMESTEADS LOTS", AND CONTAINING AN AREA OF 4.753 ACRES, MORE OR LESS.

SAID PARCEL OF LAND BEING MORE PARTICULARLY DESCRIBED IN FIRST AMENDMENT TO AND RESTATED DECLARATION OF CONDOMINIUM PROPERTY REGIME OF PACIFIC SHORES DATED NOVEMBER 5, 1992, FILED IN THE BUREAU OF CONVEYANCES OF THE STATE OF HAWAII AS DOCUMENT NO. 92-180145, OF WHICH THE ORIGINAL DECLARATION, DATED JULY 12, 1989, IS RECORDED IN THE BUREAU OF CONVEYANCES OF THE STATE OF HAWAII IN LIBER 23472 AT PAGE 48.

BEING ALL OF THE PREMISES CONVEYED TO **KIMBERLY L. BURGER, UNMARRIED, AS TENANTS IN SEVERALTY**

(**APARTMENT** DEED RECORDED **OCTOBER 02, 2006** AS REGULAR SYSTEM DOCUMENT NO. **2006-179984** OF OFFICIAL RECORDS.)

# EXHIBIT B

# INITIAL INTEREST℠ ADJUSTABLE RATE NOTE



(1-Year LIBOR Index-Rate Caps)
(Assumable after Initial Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| SEPTEMBER 21, 2006 | KIHEI | HAWAII |
|---|---|---|
| *Date* | *City* | *State* |

2219 SOUTH KIHEI ROAD #B202, KIHEI, HI  96753-7203
*(Property Address)*

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   329,600.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is _____
WELLS FARGO BANK, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.375%.

The interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month on the first day of each month beginning on NOVEMBER 1, 2006 .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.
Each monthly payment will be applied as of its scheduled due date and if the payment consists of both principal and interest, it will be applied to interest before Principal. If, on OCTOBER 1, 2036  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at WELLS FARGO BANK, N.A.
P.O. BOX 17339, BALTIMORE, MD  21297-1339
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Before the first fully amortizing principal and interest payment due date stated in subsection (C) below (the "First P&I Payment Due Date"), my monthly payments will be only for the interest due on the unpaid principal of this Note.

Each of my initial monthly payments will be in the amount of U.S. $   1,751.00 . This amount may change in accordance with subsection (C) below.

### (C) Monthly Payment Changes

The First P&I Payment Due Date is NOVEMBER 1, 2011  .

Prior to the First P&I Payment Due Date, my monthly payment may change to reflect changes in the interest rate I must pay in accordance with Section 4 of this Note or to reflect changes in the unpaid principal of my loan in accordance with Section 5 of this Note. Before the effective date of any change in my monthly payment, the Note Holder will deliver or mail to me a notice of the change in accordance with Section 8 of this Note. The notice will include the title and telephone number of a person who will answer any question I may have regarding the notice.
Beginning with the First P&I Payment Due Date, my monthly payment will change to an amount sufficient to repay the principal and interest at the rate described in Section 4 of this Note.

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Interest Change Dates

The interest rate I will pay may change on the first day of OCTOBER, 2011  ,
and may change on that day every 12 th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

INITIAL INTEREST ADJUSTABLE RATE NOTE-1-Year LIBOR Index
(Assumable after Initial Period)--Freddie Mac UNIFORM INSTRUMENT

Initials ____

IO009A      REV. 05/24/06

### (B) The Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in "The Wall Street Journal." The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding two and one-quarter percentage point(s) ( 2.250% ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First P&I Payment Due Date, my monthly payment will be the amount sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. For payment adjustments occurring on or after the First P&I Payment Due Date, my monthly payment will be an amount sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Interest Change Date will not be greater than 11.375 % or less than 2.250 %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than two percentage point(s) ( 2.000% ) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.375 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.

If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, my partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the last interest only monthly payment, my partial Prepayment may reduce the amount of my monthly payments beginning with the monthly payment due after the Interest Change Date following the partial Prepayment. After the first Interest Change Date, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then:  (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Initials: 



## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be  5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

Initials

IO009E  REV. 03/02/06


**(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

### Transfer of the Property or a Beneficial Interest in Borrower.

As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

### Transfer of the Property or a Beneficial Interest in Borrower.

As used in this section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)
KIMBERLY L BURGER                         -Borrower

IOO09I  REV. 06/23/06

# EXHIBIT C



R-263    **STATE OF HAWAII**
**BUREAU OF CONVEYANCES**
**RECORDED**
OCT 02, 2006    08:01 AM
Doc No(s) 2006-179985

/s/ CARL T. WATANABE
**REGISTRAR OF CONVEYANCES**

29   2/3   Z6



After Recordation Return By: Mail [X] Pickup [ ]    To:

**WELLS FARGO BANK, N.A.**
**FINAL DOCUMENTS X9999-01M**
**1000 BLUE GENTIAN ROAD**
**EAGAN, MN 55121-1663**

TG: 200639184A
TGE: AU2030495

Shannon M. Cortez

*29 PAGES*

— Space Above This Line For Recording Data —

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated SEPTEMBER 21, 2006 together with all Riders to this document.
**(B) "Borrower"** is
KIMBERLY L BURGER, AN UNMARRIED WOMAN

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is WELLS FARGO BANK, N.A.

Lender is a National Association
organized and existing under the laws of THE UNITED STATES OF AMERICA

HAWAII - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Page 1 of 18    Initials: 

FORM 3012   1/01

6HI01   Rev 07/18/01

Lender's address is
**P. O. BOX 5137, DES MOINES, IA 50306-5137**
Lender is the mortgagee under this Security Instrument.
**(D) "Note "** means the promissory note signed by Borrower and dated **SEPTEMBER 21, 2006**.
The Note states that Borrower owes Lender **THREE HUNDRED TWENTY-NINE THOUSAND SIX HUNDRED AND NO/100** Dollars
(U.S. $ ..329,600.00..............) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **OCTOBER 1, 2036**
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider   [X] Condominium Rider   [X] Second Home Rider
[ ] Balloon Rider   [ ] Planned Unit Development Rider   [ ] 1-4 Family Rider
[ ] VA Rider   [ ] Biweekly Payment Rider   [ ] Other(s) [specify]

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that

SHI02   Rev 12/18/00        Page 2 of 18      Initials:        FORM 3012   1/01

governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's convenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in the

|  | of | MAUI | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**LEGAL DESCRIPTION ATTACHED HERETO AND BY THIS REFERENCE MADE APART HEREOF**

. **THIS IS A PURCHASE MONEY MORTGAGE.**

Parcel ID Number:                                              which currently has the address of
**2219 SOUTH KIHEI ROAD #B202**                                                              [Street]
**KIHEI**                                        [City] , Hawaii            **96753-7203**   [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be

required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination

or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In

either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or



(c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.



In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by

this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provision of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly



requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer or servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.

The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials: (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environment Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or

before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give Borrower notice of sale in the manner provided in Section 15. Lender shall publish a notice of sale and shall sell the Property at the time and place and under the terms specified in the notice of sale. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower relinquishes all right of dower and curtesy in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____

_____   (Seal)
KIMBERLY L BURGER                      Borrower

STATE OF HAWAII,   MAUI                                        ss:

    On this **21ST**      day of        **SEPTEMBER, 2006**        , before me
personally appeared
**KIMBERLY L,BURGER, AN UNMARRIED WOMAN**

to me known to be the person described in and who executed the foregoing instrument and
acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires: _MARCH 19, 2008_

Ronald Scott Musgrave
Notary Public - Arizona
Maricopa County
My Commission Expires
March 19, 2008

RONALD SCOTT MUSGRAVE
Notary Public, State of Hawaii  ARIZONA

Notary Public

# INITIAL INTEREST$^{SM}$ ADJUSTABLE RATE RIDER
### (1-Year LIBOR Index-Rate Caps)
### (Assumable after Initial Period)

This Initial Interest Adjustable Rate Rider is made this <u>21st day of SEPTEMBER, 2006</u>................., and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Initial Interest Adjustable Rate Note (the "Note") to ......................................
<u>WELLS FARGO BANK, N.A.</u>........................................................................................................ (the "Lender") of the same date and covering the property described in the Security Instrument and located at: <u>2219 SOUTH KIHEI ROAD #B202, KIHEI, HI, 96753-7203</u>.................................................
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an Initial Interest Rate of ...<u>6.375</u>... %. The Note provides for interest only payments until the first fully amortizing principal and interest payment due date (the "First P&I Payment Due Date"), which is the first day of <u>NOVEMBER 1, 2011</u>..........

The Note provides for changes in the interest rate and the monthly payments as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Interest Change Dates

The interest rate I will pay may change on the first day of <u>OCTOBER, 2011</u>............................., and may change on that day every <u>12</u> th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

### (B) The Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in "The Wall Street Journal." The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

INITIAL INTEREST ADJUSTABLE RATE RIDER-1-Year LIBOR Index

(Assumable after Initial Period)--Freddie Mac UNIFORM INSTRUMENT
page 1

IO036A Rev. 07/13/06



**(C) Calculation of Changes**

Before each Interest Change Date, the Note Holder will calculate my interest rate by adding **two and one-quarter percentage point(s) ( 2.250%)** to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First P&I Payment Due Date, my monthly payment will be the amount sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. For payment adjustments occurring on or after the First P&I Payment Due Date, my monthly payment will be an amount sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than **11.375** % or less than **2.250** %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than **two percentage point(s) ( 2.000%)** from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **11.375** %

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

IOO36C Rev. 06/06/06

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**1. UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

Transfer of the Property or a Beneficial Interest in Borrower.
As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**2. AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1. ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

Transfer of the Property or a Beneficial Interest in Borrower.

As used in this section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
KIMBERLY L BURGER                                              -Borrower

*page 4*                                          IO036G  Rev. 03/30/05

# CONDOMINIUM RIDER



THIS CONDOMINIUM RIDER is made this ....21st day of SEPTEMBER, 2006............ , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to ................................................................................................
...... WELLS FARGO BANK, N.A. ...............................................................................................
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: ...... 2219 SOUTH KIHEI ROAD #B202 ..................................................................
............ KIHEI, HI 96753-7203 ...........................................................................................
(Property Address)

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as: .... KAMAOLE HOMESTEADS ..............................................
(Name of Condominium Project)

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Condominium Obligations.** Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

MULTISTATE CONDOMINIUM RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3140 1/01   (Page 1 of 3)<br/>EC023L Rev. 11/13/00

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

MULTISTATE CONDOMINIUM RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3140 1/01   (Page 2 of 3)
EC023L Rev. 11/13/00

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)
KIMBERLY L BURGER                    -Borrower

MULTISTATE CONDOMINIUM RIDER
Single Family - FNMA/FHLMC Uniform Instrument

Form 3140 1/01   (Page 3 of 3)
EC023L Rev. 11/13/00

# SECOND HOME RIDER



THIS SECOND HOME RIDER is made this ....21st day of SEPTEMBER. 2006................. , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower,") whether there are one or more persons undersigned to secure Borrower's Note to . WELLS FARGO BANK, N.A.
(the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at:
2219 SOUTH KIHEI ROAD #B202
KIHEI, HI 96753-7203
*(Property Address)*

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

MULTISTATE SECOND HOME RIDER - Single Family -
Fannie Mae/Freddie Mac Uniform Instrument

Form 3890 1/01   (Page 1 of 2)
EC084L Rev. 11/13/00

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Second Home Rider.

_____(Seal)
KIMBERLY L BURGER                    -Borrower

MULTISTATE SECOND HOME RIDER - Single Family -      Form 3890 1/01   (Page 2 of 2)
Fannie Mae/Freddie Mac Uniform Instrument          EC084L Rev. 11/13/00



**PITE**

**DUNCAN**
LLP

Steven W. Pite *CA NV WA*
John D. Duncan *CA TX WA*
Peter J. Salmon
*CA ID UT WA*
David E. McAllister
*AZ CA HI OR UT WA*
Laurel I. Handley
*AZ CA ID NV*

Rochelle L. Stanford
*AZ CA OR WA*
Josephine E. Salmon
*AK CA CA NV*
Eddie R. Jimenez *CA NV TX*
Susan L. Pelit *AK CA WA*
Cuong M. Nguyen *CA NV*
Casper J. Rankin *CA OR*
Charles A. Correia *CA*
Brian A. Paino *AZ CA TX VA*
Christopher McDermott *CA*
Jillian A. Benbow *CA*
Drew A. Callahan *CA*
Natalie T. Nguyen *CA*
Genall M. Anderson *CA*
Ellen Cha *CA MN*
Erin L. Laney *CA*
William L. Partridge *CA*
Christopher L. Peterson *CA*
Jason W. Short *CA*
Jason L. Eliaser *CA*
Joseph G. Delmotte *CA*
Gabriel Ozel *CA NY TX*
Balpreet K. Thiara *CA*
Catherine T. Vinh *CA*
Gregg A. Hubley *CA*
Ace C. Van Patten *ID NV*
Beau Bennett *CA HI*
Christopher A. J. Swift *CA NV*
Claire A. Mock *CA TX*
Spencer Macdonald *UT*
Jesse Baker *OR UT WA*
David J. Boulanger *OR*
Carrie Thompson Jones *AZ*
Chad L. Butler *CA*
Gilbert R. Yabes *CA*
Matthew M. McArthur *NV*
Matthew R. Clark, III *CA*
Arnold L. Graff *CA NV*
Philip J. Giles *CA*
Parula Kovadi *CA*
Renee Belcastro *CA*
Gagan G... Vaideeswaran *CA*
Jared D. Bissell *CA*
Todd S. Garan *CA*
Cara C. Christensen *WA*
Michael J. Crahenbuhl *CA*
Grant M. Tabor *TX*
Brandon M. Love *CA*
K. Alexandra Cavin *NV*
Christian Fenton *CA HI*
Justin S. Meyer *CA*
Paul A. Hocker *TX*
Crystal M. Talco *NV*
Hunter B. Zook *OR*
Tracy J. Frazier *OR WA*
Elisa S. Magnuson *CA ID*
Eric L. Cook *AZ*
Eric Tsai *CA*
Michael Baker *CA*
Julia A. Bahner *WA*
Rachael H. Kim *WA*
Jamin S. Neil *AZ*
Bryan S. Fairman *CA*
Evan M. Daily *CA*
Robert J. Campo, Jr. *AZ CA*
Ryan A. Farmer *OR*
Megan Lees *CA*
Olga S. Panchenko *NV*
Mark G. Torabi *TX*
Jordon R. Ferguson *CA*
Irina C. Ribeiro *CA*
Greg Campbell *CA*
Elizabeth C. Thompson *CA*
Stephen T. Kitagawa *CA*
Kimberley V. Dicola *CA*
Diane E. Bond *CA*

David B. Rosen HI
*Of Counsel*

*Mailing*
375 Jutland Drive, Suite 200
P.O. Box 17935
San Diego, CA 92177-0935
*Overnight*
375 Jutland Drive, Suite 200
San Diego, CA 92117
Tel.: (858) 750-7600
Fax: (619) 590-1385

March 9, 2012

**VIA CERTIFIED MAIL-RETURN RECEIPT REQUESTED
AND FIRST-CLASS MAIL**

Kimberly L. Burger
2219 South Kihei Road #B202
Kihei, HI 96753

Kimberly L. Burger
6960 East Madero Ave
Mesa, AZ 85209

Re:     **Property Address: 2219 South Kihei Road #B202, Kihei, HI 96753**
        **Loan No.:** ████████
        **Our File No.: 000515-007014**

Dear Ms. Burger:

This firm has been authorized by Wells Fargo Bank, N.A. ("Wells Fargo"), the creditor to whom the debt on the above-referenced home loan (hereinafter referred to as "the Debt") is owed, to contact you regarding the status of your account.

You are hereby provided formal notice that you are in default under the terms and conditions of the Note and Security Instrument (i.e., Deed of Trust, Mortgage, etc.) for failure to pay the required installments when due, as of April 1, 2011.

This letter serves as further notice that Wells Fargo intends to enforce the provisions of the Note and Security Instrument. You must pay the full amount of the default on this loan by the thirty-third (33rd) day from the date of this letter, which is April 11, 2012 (or if said date falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter). If you do not pay the full amount of the default on or before the date specified in this notice, Wells Fargo, at its option, may accelerate the entire sum of both principal and interest due and payable, and invoke any remedies provided for in the Note and Security Instrument, including but not limited to the foreclosure sale of the property. If you received a bankruptcy discharge which included this debt, this notice is not intended and does not constitute an attempt to collect a debt against you personally. Notice provisions may be contained within your mortgage/deed of trust which notice may be required prior to foreclosure.

You are hereby informed that you have the right to "cure" or reinstate the loan after acceleration and the right to bring a court action asserting the non-existence of a default or any other defense you may have to acceleration and sale. Any acceptance of payment of less than the full amount due shall not constitute a waiver of the acceleration unless otherwise agreed to, in writing, by our client.

**This is an attempt to collect a debt by a debt collector, and any information obtained will be used for that purpose. If you have received a discharge of personal liability for this debt in bankruptcy, we do not seek a money judgment against you personally, but we seek only recovery from the collateral which is security for the debt.**

Attorneys licensed to practice in Alaska, Arizona, California, Hawaii
Idaho, Nevada, New York, Oregon, Texas, Utah and Washington
*See above or visit www.piteduncan.com re individual attorney admissions.*

PITE
DUNCAN, LLP

March 9, 2012
Page 2

As of March 9, 2012, the date of this letter, the amount of the debt that Wells Fargo is seeking to collect is $23,695.83, itemized as follows:

| | |
|---|---|
| 7 Missed Payments @ $1,860.41 (4/1/2011 - 10/1/2011) | $13,022.87 |
| 1 Missed Payment @ $1,673.42 (11/1/2011) | $1,673.42 |
| 4 Missed Payments @ $1,675.64 (12/1/2011 - 3/1/2012) | $6,702.56 |
| Late Charges | $920.48 |
| Property Inspections | $180.00 |
| Attorneys' Fees and Costs | $1,196.50 |
| **TOTAL** | **$23,695.83** |

Please be advised that as of April 1, 2012, the amount of the debt will also include the April 2012 payment. Also, because of interest, late charges, and other charges that may vary from day to day and additional debt for attorneys' fees and costs that may have been incurred by Wells Fargo to protect its interest in the property and/or rights under the Mortgage, the amount due on the day that you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check, in the event we will inform you before depositing the check for collection.

For further information, please contact the undersigned. This letter is in no way intended as a payoff statement for your mortgage, it merely states an amount necessary to cure the current delinquency.

Please note, however, that your right to cure this default as referenced herein does not suspend your payment obligations. Pursuant to the terms of the Note, your April 2012 installment is still due on April 1, 2012 (or if said date(s) falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter). In addition, any advances made by Wells Fargo to protect its lien position must be added to the total amount necessary to cure the default. Please disregard this notice if a payment sufficient to cure the default has already been sent.

**Federal law gives you thirty days after you receive this letter to dispute the validity of this debt or any part of it. Unless you dispute the debt within that 30-day period, we will assume that it is valid. If you notify this law firm in writing at the firm address within the 30-day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt and will mail you a copy of the verification via first-class mail. Also, upon your written request within 30 days of this notice, we will provide you with the name and address of your original creditor on this loan, if it is different from the current creditor.**

**This is an attempt to collect a debt by a debt collector, and any information obtained will be used for that purpose. If you have received a discharge of personal liability for this debt in bankruptcy, we do not seek a money judgment against you personally, but we seek only recovery from the collateral which is security for the debt.**

2813421.wpd

PITE
DUNCAN, LLP

March 9, 2012
Page 3

A "Cure" or "Reinstatement Right" similar to that described above may be available in many states. NO PERSON IN THIS LAW OFFICE WILL GIVE YOU ANY LEGAL ADVICE. If, at any time, you make a written request to this law firm not to be contacted by phone at your place of employment, we will not do so. If, at any time, you make a written request to this law firm not to contact you, we will not do so, except by legal action.

You are notified that this default and any other legal action that may occur as a result thereof may be reported to one or more local and national credit reporting agencies.

Wells Fargo would like you to be aware that if you are unable to make payments or resume payments within a reasonable period of time due to a reduction in your income resulting from a loss or reduction in your employment, you may be eligible for Homeownership Counseling. Please contact the HUD toll free number (800-569-4287) to obtain a list of HUD-approved nonprofit organizations servicing your residential area.

Wells Fargo requests that all payments be made in **certified funds, cashier's check or money order(s)** payable to and mailed to Wells Fargo Bank, N.A., to the below address (always include Loan ████████████ with your payment):

Wells Fargo Bank, N.A.
Pite Duncan, LLP
Attn: Christian Fenton
4375 Jutland Dr., Suite 200
P.O. Box 17935
San Diego, CA 92177-0935

All written correspondence should be forwarded to:

**Pite Duncan, LLP**
**Attn: Christian Fenton**
**4375 Jutland Dr., Suite 200**
**P.O. Box 17935**
**San Diego, CA 92177-0935**

Sincerely,

Christian Fenton

cc:     Wells Fargo Bank, N.A.

**This is an attempt to collect a debt by a debt collector, and any information obtained will be used for that purpose. If you have received a discharge of personal liability for this debt in bankruptcy, we do not seek a money judgment against you personally, but we seek only recovery from the collateral which is security for the debt.**

2813421.wpd

DAVID B. ROSEN (Attorney ID No. 7152-0)
PITE DUNCAN, LLP
810 Richards Street, Suite 880
Honolulu, HI 96813
Ph.: (808) 275-4490
E-mail: RosenLaw@hawaii.rr.com

DAVID E. McALLISTER (Attorney ID No. 7660)
CHRISTIAN FENTON (Attorney ID No. 8727)
PITE DUNCAN, LLP
4375 Jutland Drive, Suite 200
P.O. Box 17935
San Diego, CA 92177-0935
Telephone: (858) 750-7600
Facsimile: (858) 412-2602
E-mail: dmcallister@piteduncan.com

Attorneys for Plaintiff WELLS FARGO BANK, N.A.

## IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

## STATE OF HAWAII

| | |
|---|---|
| WELLS FARGO BANK, N.A.,<br><br>Plaintiff,<br><br>v.<br><br>KIMBERLY L. BURGER;<br>THE ASSOCIATION OF APARTMENT<br>OWNERS OF PACIFIC SHORES;<br>and DOES 1 through 20, inclusive,<br><br>Defendants. | CIVIL NO.<br>(Foreclosure)<br><br>**SUMMONS** |

## **SUMMONS**

TO: KIMBERLY L. BURGER; THE ASSOCIATION OF APARTMENT OWNERS OF

PACIFIC SHORES; and DOES 1 through 20, inclusive:

YOU ARE HEREBY summoned and required to file with the Court and serve upon Plaintiff's counsel David B. Rosen, whose address is 810 Richards Street, Suite 880, Honolulu, Hawaii 96813, and David E. McAllister and Christian Fenton, whose address is 4375 Jutland Drive, Suite 200, San Diego, California 92117, an answer to the Complaint which is attached. This action must be taken within twenty (20) days after service of this summons upon you, exclusive of the day of service.

If you fail to make an answer within the twenty (20)-day time limit specified above, judgment by default will be taken against you for the relief demanded in the Complaint.

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m., on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.

A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.


DATED: Wailuku, Hawaii, _____ JUN 2 7 2012 _____


H. CHING   SEAL

EX OFFICIO Clerk of the above-entitled Court

2